UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| John B., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 18 CV 50109 |
| ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**[1]

Plaintiff John B. seeks Social Security disability benefits based on anxiety and depression that allegedly make it difficult for him to leave his house alone or to complete tasks on a consistent basis. To treat these problems, plaintiff has been seeing a psychiatrist who has been prescribing a series of medications for over a year, but this treatment has not yet provided satisfactory relief. After a hearing, an administrative law judge ("ALJ") found that plaintiff was not disabled, largely because plaintiff was able to do activities supposedly inconsistent with his claimed limitations. The Court finds that a remand is required because the ALJ's characterization of plaintiff as an independent self-starter is strongly at odds with the descriptions given by plaintiff and his wife. To be clear, the Court is not reweighing the evidence. The Court is remanding the case because the ALJ's decision is based on clear factual errors.

**BACKGROUND**

Sometime in 2010, plaintiff started complaining to his primary physician, Dr. James Koepsell, about nausea, sleep problems, and anxiety. R. 282. Medical tests were performed, but

---
[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

1

they did not reveal any obvious physical causes. Dr. Koepsell then began prescribing psychiatric medications. For example, in July 2011, he prescribed Cymbalta, but plaintiff reported that it had not helped his anxiety. R. 287. Other medications were tried under Dr. Koepsell's supervision. *See* R. 288 ("prozac so far has not helped but has no side effects"); R. 292 ("Zyprexa has increased his appetite," but he "still feels nauseated.").

On January 31, 2015, plaintiff filed Title II and Title XVI applications for Social Security disability benefits. He was then 34 years old.

Dr. Koepsell eventually referred plaintiff to a psychiatrist. In May 2015, plaintiff began treatment with Dr. Syed Irfan. R. 414. Over the next year, Dr. Irfan met with plaintiff once or twice a month and prescribed and then adjusted various medications in an effort to find a satisfactory solution.

On July 24, 2015, plaintiff visited consultative examiner Peter Thomas, a psychologist, who interviewed plaintiff and prepared a report. Ex. 6F. He made various observations, noting for example that plaintiff was "significantly anxious and tense" and "became tearful" at times during the interview. R. 327. Dr. Thomas diagnosed plaintiff with "Major Depressive Disorder, single episode, severe." R. 329.

On November 15, 2016, Dr. Irfan completed a mental impairment questionnaire supporting plaintiff's disability claim. Ex. 11F. He opined, among other things, that plaintiff had extreme limitations in social functioning and marked limitations in concentration, persistence or pace. R. 417.

On December 17, 2016, the administrative hearing was held. Plaintiff was represented by counsel. The ALJ called a vocational expert but did not call a medical expert.[2] The hearing was

---

[2] Plaintiff's counsel did not ask that an expert be called.

2

relatively short. Plaintiff testified that he was married and living with four children, "one of [his] own and three stepchildren." R. 30. The children were then 6, 11, 13, and 14 years old. Plaintiff had graduated from high school, and last worked in the mail room at an insurance company but had to quit because of his psychological problems. He stated that his anxiety made him very uncomfortable around people, even just standing next to them. He had constant negative thoughts running through his head making him feel bad. When asked whether the medications prescribed by Dr. Irfan were helping, he answered "no." R. 35.

Plaintiff testified that he did not help cook any meals at home for his children and generally did not do any cleaning or laundry or yard work. When his children were at school, he just "[sat] on the couch and [tried] to make the thoughts stop." R. 36. He sometimes watched television but did so just for "a couple minutes" to take his mind off his negative thoughts. *Id.* He sometimes went to dinner with friends, and two friends sometimes came over to his house to play cards and board games. He smoked marijuana twice a day to help with a stomach ailment that made him nauseated. In the past two years, his family has gone on vacations, but plaintiff did not go because the "anxiety of the thought of being with strange people or in a strange setting was too much." R. 43. At the most recent Thanksgiving at his wife's family's house, he stayed in the basement without interacting with the adults.

On March 17, 2017, the ALJ found plaintiff was not disabled. The ALJ found that plaintiff had the following severe impairments: "persistent depressive disorder with intermittent major depressive disorder, social anxiety disorder, obsessive-compulsive disorder, and marijuana abuse." R. 12. The ALJ found that plaintiff did not meet any Section 12.00 psychological listing. The ALJ applied the new paragraph B criteria that became effective March 24, 2017. Specifically, the ALJ found that plaintiff had moderate limitations in each of the four categories:

3

(i) understanding, remembering, or applying information; (ii) interacting with others; (iii) concentrating, persisting or maintaining pace; and (iv) adapting or managing oneself. R. 13-14.

In the residual functional capacity ("RFC") analysis, the ALJ found that plaintiff could do the full range of work except that he could only "understand, remember and carryout simple, routine and repetitive tasks; use judgment limited to simple work related decisions; occasionally interact with supervisors; and have brief and superficial interaction with coworkers and the public." R. 15. The ALJ found that plaintiff was not credible based on his activities and the objective evidence. As for the medical opinions, the ALJ gave "little weight" to Dr. Irfan's opinion because it was supposedly at odds with his own treatment notes and with plaintiff's activities. The ALJ gave "little weight" to Dr. Thomas's consultative report, which stated that plaintiff had "significant difficulties" in functioning, because this statement was vague. R. 18. The ALJ gave great weight to the opinion of state agency psychologist Ellen Rozenfeld who limited plaintiff to simple repetitive tasks in a socially undemanding setting. The ALJ found that this finding was consistent with the objective evidence and with plaintiff's activities.

**ANALYSIS**

Plaintiff raises three arguments for remand. The first is that the ALJ found that plaintiff had moderate limitations in concentration, persistence, or pace but then failed to account for this limitation in either the RFC or in the hypothetical questions posed to the vocational expert. This is the often-raised argument based on Seventh Circuit cases, such as *Yurt* and *O'Connor-Spinner*, holding that a limitation to simple tasks does not necessarily address problems with maintaining concentration over longer periods. The second argument is that the ALJ relied on a distorted picture of plaintiff's activities. The third argument is that the ALJ erroneously disregarded Dr.

4

Irfan's opinion. Because the Court finds that the second argument is the most encompassing and that it justifies a remand by itself, the Court will begin with and mostly focus on it.

The ALJ found that plaintiff could do various activities inside and outside the home that were supposedly inconsistent with his self-reported statements about what he could do. Before looking more closely at this rationale, a few background points should be noted. First, this was an important rationale supporting the overall decision, maybe even the most important one. The ALJ referred to it throughout the decision. It was mentioned early on in the listing analysis and then was thereafter repeatedly pulled out, as a kind of "go to" rationale." For example, it was cited as one of the two main reasons for rejecting Dr. Irfan's opinion and for accepting Dr. Rozenfeld's opinion—even though neither doctor focused much on this rationale. In sum, to the extent that this rationale rested on factual errors or distortions, these cannot be dismissed as trivial errors. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistences or contradictions, we give it a commonsensical reading.").

Second, the ALJ's findings are based entirely on statements made by plaintiff or his wife. These statements fall into three categories: (i) plaintiff's hearing testimony; (ii) various written statements—specifically, three function reports completed by plaintiff and his wife (Exs. 10E, 11E, 12E), and a letter written by plaintiff's wife (Ex. 9E); and (iii) a few statements the ALJ culled from treatment notes or from the consultative examiner's report. There was thus a stockpile of similarly worded statements the ALJ could draw from, making it more likely that inadvertent discrepancies might be found. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (cautioning that the "many interviews and forms required to apply for disability benefits should not be viewed as traps for slightly varied accounts of daily activities"). The relevant question to be assessed here is whether the ALJ's summary of these many statements was accurate,

complete, and fair. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (analysis of daily activities "must be done with care"). Spoiler alert—it was not.

Third, it will be helpful to catalogue the different limitations plaintiff is claiming. He asserts that he is only comfortable unless he is "at home and no one is bothering him"; he has difficulty going out in public without a family member, and when he does go out, he isolates himself and "stays in a corner"; he has problems concentrating and staying on task and often requires reminders to get things done; he is generally not motivated to do much of anything; and he would have difficulty show up consistently for work. Dkt. #11 at 7. These are the contentions the ALJ thought were contradicted by plaintiff's activities.

With these points in mind, the Court turns to the ALJ's findings. Starting at the most concrete level, the ALJ found that plaintiff was doing the following specific activities: driving his children to school; attending his son's soccer game; going to dinner with friends; shopping in a store; attending church; visiting grandparents; exercising weekly at the YMCA; preparing simple meals; washing clothes; changing the oil in the car; taking out the trash; and managing the household finances. R. 14-16. Moving up the ladder of abstraction, the ALJ found that plaintiff was taking care of his children, managing the household finances, and engaging in social activities with friends. Perhaps the most general statement came at the end of the decision where the ALJ stated that plaintiff could engage in "independent and sustained activities" of daily living. R. 18. Collectively, these statements give the impression that plaintiff was a self-starter doing many chores and activities while actively taking care of four children.

However, after reading the source materials relied on by the ALJ, the Court finds that the ALJ mischaracterized the evidence. In too many instances, the ALJ engaged in cherrypicking by choosing the most unfavorable verbal formulations taken from many possible choices and then

6

by aggressively turning them into broader blanket propositions. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"). At the same time, the ALJ ignored or blandly summarized statements favorable to plaintiff. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (ALJs cannot ignore contrary lines of evidence). The Court will discuss a few examples to support these conclusions.

> The most troubling mischaracterization is the following claim made by the ALJ:
>
> Notably, despite the claimant's reports that he did not feel like doing anything, he indicated that he finished things he started and following instructions fine.

R. 16. If true, this is a powerful statement. The claim that plaintiff "*indicated* that he finished things he started" is basically an admission against interest, directly contradicting his main allegation for why he should be found disabled. But the problem is that the source the ALJ cited to, Exhibit 11E at 6, simply does not support the ALJ's claim. Worse, it says just the opposite. Set forth below is a screenshot of the passage the ALJ was relying on:

**SECTION D – INFORMATION ABOUT ABILITIES**

20. a. Check any of the following items that your illnesses, injuries, or conditions affect:

- ☐ Lifting
- ☐ Walking
- ☐ Stair Climbing
- ☐ Understanding
- ☐ Squatting
- ☐ Sitting
- ☐ Seeing
- ☐ Following Instructions
- ☐ Bending
- ☐ Kneeling
- ☐ Memory
- ☐ Using Hands
- ☐ Standing
- ☐ Talking
- ☒ Completing Tasks
- ☐ Getting Along with Others
- ☐ Reaching
- ☐ Hearing
- ☐ Concentration

Please explain how your illnesses, injuries, or conditions affect each of the items you checked. (For example, you can only lift [how many pounds], you can only walk [how far])

I don't feel like doing anything.

R. 228. The ALJ's interpretation suggests that plaintiff was basically extolling his own virtues, as if he were on a job interview. But the only reasonable interpretation is that plaintiff was doing

7

the opposite—namely, revealing his limitations. If there were any doubt about the meaning of the checkmark in the box, plaintiff's handwritten explanation that he did not "feel like doing anything" makes the point clear. Accordingly, the ALJ's statement rests on a factual error. *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (remanding and noting that the ALJ made "a blatant factual error" in characterizing the claimant's testimony); *Anderson v. Colvin*, 2013 WL 1629156, *2 (N.D. Ind. Apr. 15, 2013) ("Straight factual errors like this obviously cannot stand"). To be clear, this was not a trivial error mentioned once in passing. The ALJ referred to this rationale several times and prefaced it with the word "notably," ensuring that the reader would not overlook the significance the ALJ was giving to it. *See* R. 14, 14, 16.

Although not as extreme as the first example, the ALJ engaged in other one-sided analyses. Consider the ALJ's claim that plaintiff was "caring for his children." *See, e.g.*, R. 14. The ALJ made this claim several times, often stating it in unqualified terms. This gave the impression that plaintiff was the primary parent in charge of the children and juggled multiple demands in running the household while his wife was working four jobs to make ends meet. R. 210. But this view is starkly at odds with statements plaintiff and wife made. These include the following:

- "He mostly lays around the house and plays on his phone. He will sit in the recliner in the living room with the kids. He can do some physical tasks—like shovel or drive kids to school, but then has to rest after again."

- "He usually drives the kids to school, then sits in a chair and plays some games on his phone. He might do a chore or two. Nothing of significance until he picks kids up, then he comes home & waits for wife. He sits on couch & plays on phone during dinner. TV maybe."

- "He supervises older children – 13, 12, 10, 5, so he has the oldest do stuff for the youngest. Drives them to school."

- "He takes [children] to/from school, supervises them, but makes the oldest make food, care for 4 yr. old."

8

- "He sits around at home constantly unless I make him do something, like drop kids off or go shovel."

- "Wife – does all cooking, almost all cleaning, oldest kid gets youngest stuff like glass of milk when mom is working."

- "Sometimes he is able to get a chore or two done, like putting a load of laundry in the washing machine or loading the dishwasher, but never consistently enough that I can count on it."

- "I have to make him get out of bed in the morning & he tries to take tons of naps—he never gets anything done unless I yell. He barely does anything without me."

R. 210, 212, 230, 237, 243. The ALJ failed to acknowledge this evidence when asserting that plaintiff was capably caring for his four children. The above statements cast doubt on the ALJ's Norman Rockwell painting of the household.

Another questionable finding is the claim that plaintiff was "managing his household finances." R. 14. Here again, the source materials raise doubts about the accuracy of this description. On the function reports, plaintiff checked the boxes indicating that he could pay bills, count change, handle a savings account, and use a checkbook or money order. R. 214, 226, 239. But this question merely asked whether plaintiff was "able to" do these tasks—not whether he was actually doing them on a regular basis. More importantly, plaintiff's wife added the following handwritten explanations below these checkbox answers:

> Explain all "NO" answers. He never pays the bills - always wife does it - he will only write a check if wife requests he do it for something like a kid field trip

\* \* \*

9



R. 214, 239. The ALJ never mentioned these contrary statements, which clash with the ALJ's unqualified statement that plaintiff was managing the household finances.

Another topic is plaintiff's social life. The ALJ concluded generally that plaintiff was engaging in "social activities with friends and family." R. 18; *see also* R. 17. The ALJ's descriptions give the impression that this was a frequent and easy activity. But the ALJ again did not acknowledge various contrary statements. To cite one counter-example, plaintiff gave the following testimony at the hearing:

> Q  Do you have any friends?
>
> A  Yes, I do.
>
> Q  Do you ever go out with your friends?
>
> A  We have gone out to dinner before.
>
> Q  How'd that—and when's the last time you did that?
>
> A  Two months ago.
>
> Q  And how did that go?
>
> A  That was nerve wracking, but I made it.

R. 36-37. The Court recognizes that the ALJ also cited to one reference in Dr. Irfan's treatment records where plaintiff stated that his mood improved when in the company of friends. R. 14 (citing R. 339). But he never stated that this occurred while eating out in public. In any event, it

is not necessarily inconsistent that he could do some social activities when accompanied by close friends or family.

The Court could continue this critique and cite several more similar examples, but the above examples are sufficient to support the conclusion. In addition to the problem of cherrypicking, the ALJ's analysis also failed to give sufficient attention to the issue of frequency and sustainability. To be able to work a full eight-hour day, plaintiff would have to be able to do these types of activities reliably and consistently over a sustained period. On remand, the ALJ should inquire further into these issues. *See, e.g., Castaneda v. Colvin*, 2016 WL427511, * 2 (N.D. Ill. Feb. 4, 2016) (ALJ's analysis of daily activities "did not explore the manner or duration of chores and yardwork that Plaintiff report[ed] performing").

Having concluded that a remand is justified, the Court will not discuss at length all of plaintiff's other arguments. Several of them likely will be affected after a more complete analysis of plaintiff's activities is conducted. For example, this rationale was used to discredit Dr. Irfan's opinion. However, the Court does offer a few additional observations to guide the ALJ and the parties on remand. Hopefully, the parties and ALJ will read and follow this order.

First, in the credibility analysis, the ALJ did not provide a meaningful discussion of plaintiff's treatment. This is one of the factors set forth in SSR 16-3p. Plaintiff has raised a valid complaint that the ALJ only briefly discussed the fact that plaintiff and his doctors had tried numerous medications and had struggled to find a combination that would work effectively. *See* SSR 16-3p ( "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent").

11

Second, and related to the previous point, the Court notes that little attention has been given to the question of why plaintiff did not try counseling. Dr. Irfan, whose role was apparently limited to medication management, repeatedly encouraged plaintiff to try counseling. *See* R. 379 (8/27/15: "I also discussed with him seeing a therapist in the office. The patient is reluctant at this point. I will gently push him towards seeing a therapist so that he may benefit from it as his symptoms need for him to see a therapist regularly."); R. 384 (1/6/16: "The patient is not willing to see a therapist." and "I also encouraged him to at least give it a shot and see a therapist and he may learn ways to deal with anxiety and mood in ways that he doesn't know how to at this point. The patient agreed on doing so also."). Dr. Thomas made a similar recommendation in his report, stating as follows:

> To this point the claimant has not benefited significantly from any psychotropic medication treatment. The claimant may benefit from engagement in care from a psychiatrist as well as engagement in individual and possibly family or marital therapy where some of the underlying psychological components of his illness [can] be addressed and ameliorated. *Until then*, claimant appears to have significant difficulties in functioning despite a desire that is sincere to do so.

R. 328 (emphasis added). This statement suggests that Dr. Thomas believed that it was *possible* for plaintiff overcome his current problems through talk therapy. This is a more hopeful outlook, and it contrasts with the phrase "treatment resistant depression," which was used in plaintiff's initial application and which has a fatalistic cast to it, especially given plaintiff's relatively young age. *See* R. 249. However, it is not clear where that expression came from, as the Court did not see it being used by plaintiff's treating doctors or by Dr. Thomas. In any event, this issue was briefly raised at the hearing when the ALJ asked plaintiff whether he had tried counseling and plaintiff stated that he had not. R. 35. But unfortunately, there was no follow-up, and we

therefore do not know why plaintiff was not willing to try counseling.[3] Also, the Court notes that the ALJ made one brief reference in the decision to the fact that plaintiff had "never sought therapy," but the ALJ did not place much weight on this fact. R. 15. On remand, this topic should be explored more carefully. This is a valid topic to consider, and plaintiff's failure to pursue this therapy may prove to be a stumbling block to his claim.

Third, although plaintiff did not specifically use the phrase "doctor playing," the ALJ's decision can be criticized on this ground. *See Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (remanding because the ALJ improperly played doctor). The ALJ did not call a medical expert at the hearing. Although the ALJ did claim to be relying on Dr. Rozenfeld's RFC finding, the ALJ's analysis does not track her reasoning. Her reasoning was brief, but the main rationale appears to be that plaintiff was non-compliant in taking medications. R. 94 (stating that plaintiff "admit[ted] to non-compliance"). However, the ALJ did *not* rely on this rationale—at least according to the Government's reading of the ALJ's decision. *See* Dkt. 21 at 11 (stating that non-compliance was an argument "the ALJ did not make").

The ALJ's doctor playing was most evident in her analysis of the objective evidence and how it was allegedly inconsistent with plaintiff's subjective allegations. A few examples can be cited. Consider this sentence: "Despite reports of overwhelming anxiety in public, the claimant made good eye contact." R. 17. The ALJ clearly believed that this was a contradiction, but it is not obvious why the ability of a patient to make eye contact during a private doctor's visit casts doubt on the veracity of that patient's claim that he was experiencing anxiety while in public settings. Here's another example: "In February 2015, the claimant had a constricted affect and

---

[3] But the ALJ did asked plaintiff whether Dr. Irfan had recommended counseling, and plaintiff stated that "[h]e has not." R. 35. This testimony is at odds with the treatment notes quoted above.

anxious mood, but denied hallucinations and delusions." R. 16.[4] Here again, the ALJ seems to be indicating that there was a contradiction. That is, the claim that plaintiff was having an "anxious mood" is juxtaposed against the statement that she was not having hallucinations or delusions. Putting aside the philosophical puzzle as to how plaintiff would have had the self-knowledge to know he was deluded, this sentence posits a connection that has not been verified by a medical authority. Is it really the case that allegations of anxiety should be doubted if the patient does not also have hallucinations and delusions? The bigger problem running throughout the decision is not that the ALJ was necessarily wrong in all her suppositions about the objective evidence, but that they were based solely on her layperson intuitions. *See Lambert v. Berryhill*, No. 17-1627 at p. 8 (7th Cir. July 19, 2018) ("ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves.").

Fourth, the Court acknowledges that the parties have raised other arguments that this Court has not addressed for the reasons already stated. Among these arguments is the Government's contention that the new Paragraph B criteria have changed the arguments about moderate concentration based on the *O'Connor-Spinner* line of cases. This is an argument that can be addressed more fully on another occasion, although the Court notes that the Government has not cited to any Seventh Circuit case law endorsing this argument and it is not clear how the specific definition of concentration has changed.

On remand, the ALJ should call a medical expert, either a psychologist or psychiatrist, at the hearing to opine about the issues raised herein. Moreover, plaintiff's counsel should explicitly raise all arguments, including any not specifically discussed here, with the ALJ, both in the pre-hearing letter brief and at the hearing itself. Failure to raise these arguments could

---

[4] The ALJ referred several more times to the lack of hallucinations and delusions.

result in a waiver of them, or otherwise diminish their credibility, if they are presented again here in a subsequent appeal.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded for further proceedings.

Date: November 7, 2019  By: _____
Iain D. Johnston
United States Magistrate Judge